Mortimer v State of New York (2024 NY Slip Op 51391(U))

[*1]

Mortimer v State of New York

2024 NY Slip Op 51391(U)

Decided on September 23, 2024

Court Of Claims

Mejias-Glover, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 23, 2024
Court of Claims

Anisah T. Mortimer, Claimant,

against
State of New York, Defendant.

Claim No. 133691

For Claimant:
SOBO & SOBO LLP
By: Melanie-Ann Delancey, Esq.
For Defendant:
LETITIA JAMES, ATTORNEY GENERAL
By: James Gardner Ryan, Esq.
Assistant Attorney General

Linda K. Mejias-Glover, J.

A trial on the sole issue of liability was conducted before this Court on December 6 and 7, 2023, via Microsoft Teams, upon the consent of all parties and counsel. Claimant testified and called two witnesses to testify, and Defendant called one witness to testify.
The parties stipulated to the following facts: this case involved a motor vehicle accident that occurred on October 3, 2018, at approximately 10:21 a.m. The incident occurred on State Highway 97 in the Town of Deerpark, County of Orange. It was daylight at the time of the incident and there was no precipitation falling from the sky. On the date of the accident, Claimant Anisah T. Mortimer was the owner and operator of a 2018 Mercedes bearing a New York State license plate reading "MORTIMER". Claimant was traveling Northwest on State Highway 97. Claimant approached a New York State Department of Transportation (hereinafter "DOT") work zone where DOT vehicles were parked on the right shoulder of the road. Claimant's vehicle impacted the side of the last parked DOT vehicle. The DOT vehicle impacted was a 2019 Dump truck bearing license plate "195074" for the State of New York operated by Jerry Williams. The DOT vehicle impacted was parked and not moving. Following the incident, police and emergency crews responded and Officer Christine Garry filed a Police Accident Report.
Relevant Testimony
Claimant, Anisah Mortimer
Ms. Mortimer testified that on October 3, 2018, she had her 2018 blue Mercedes-Benz convertible serviced in Wappingers Falls and once complete, she left and proceeded toward her [*2]home when she was involved in a motor vehicle accident (T1 [FN1]
. 14-15). She testified that the accident occurred in front of John's Mowers on Route 97, which consists of two lanes, divided by a double yellow line, one traveling in each direction (T1. 15). She testified that on the day of the accident, she was traveling down a hill when she observed four utility trucks about 400-500 feet in front of her, "just sitting there," facing the opposite direction of her travel (T1. 15-16). Ms. Mortimer testified that she was traveling at a speed of 30 miles per hour as she approached the utility trucks (T1.16). She testified that the first three utility trucks were parked approximately two feet back from the solid white line and the fourth truck was parked on the white line (T1. 16-17). She went on to testify that she could not recall when she first saw the fourth truck, but when she did, she pulled over to the yellow line on her left, struck the stabilizing arm of the truck, which spun her vehicle around and landed on the other side of the road facing John's Mowers (T1. 17-18, 20). She reiterated that her vehicle was right by the yellow line, not on it, nor was her vehicle to the right of the white line (T1. 18). She testified that there were vehicles traveling in the other direction coming towards her when she drove past the parked trucks (T1. 32).
Ms. Mortimer testified that after her vehicle impacted with the DOT truck, her vehicle via On Star contacted the police (T1. 21). After reviewing Claimant's Exhibit 1, she testified that the photograph depicted pieces of her vehicle, as well as the fourth DOT truck's stabilizing arm that stuck out over the white line (T1. 21-22) and then later testified that she did not see any part of the truck intruding into the travel lane (T1. 30, 37). She explained that the stabilizing arm serves to stabilize the truck when they are doing "heavy work" (T1. 31-32). After reviewing Claimant's Exhibit 6, she testified that the photograph depicted the damage on the right front end and door of her vehicle, as a result of the accident (T1. 23-24).
Ms. Mortimer testified that the sky on the date of the accident was clear, and it was "nice outside" (T1. 25) and the traffic was light (T1. 32). She testified that she had no issues operating her vehicle as she drove from Wappingers Falls towards her home in Sparrow Bush, an approximate 45 minute to 1 hour drive (T1.25). She further testified that she drives daily on Route 42, past John's Mowers, within the travel lane, driving between the white line and double yellow line and not crossing over either line (T1. 27-28).
Ms. Mortimer was shown her deposition and asked if she recalled giving the following answers to the following questions and used her deposition transcript [FN2]
 to refresh her recollection on the following:
"Question, did you maintain that speed as you approached the vehicles? Answer, yes, I did. And in addition to the vehicles did you see any cones or orange cones in this roadway? Answer, no, I did not, didn't. Question, in addition to the vehicles themselves, well, the vehicles that you saw, where were they? Answer, they were parked on the side of the road. They were maybe about six to eight feet apart and they were parked the wrong way. They weren't facing the right way. I was coming down. They're parking, you know, for going up. Question, okay, did you see anything with regard to the—did you do anything with regard to the operation of your vehicle when you saw them? [*3]Answer, no. Question, the direction you were traveling had a single lane. Answer, yes. Was there an opposing lane of traffic to the left? Answer, yes. What was the traffic like in the opposing lane of travel? Answer, there was no one there. Was that true for the entire distance as you approached the DOT trucks? Yes. At some point did you start to pass the DOT trucks? Yes. And did you pass them? Yes, three of them. And what happened then? The fourth truck, I noticed it was close. The fourth truck was on the white line, so I moved over a little bit and next thing you know I hit the truck. When you say you moved over, you moved over to the left or to the right? To the right. Correction, to the left. The first truck that you passed, how far was it from the white line? Oh, it was about maybe two to three feet. And the second truck that you passed? Answer, same thing. And the second truck that you passed, how far was it from the white truck? Answer, two to three feet. And the third truck that you passed? Answer, two to three feet. And the fourth truck that you almost passed, where was that in relation to the white line? It was parked. The tires were on the white line. Question, was it tires on the white line? Answer, yes" (T1. 35-36).
She then testified that she recalls her deposition testimony (T1. 36). After reviewing Defendant's Exhibit C, she testified that the photographs, taken shortly after the accident, do not depict any part of the truck intruding into her lane of traffic on the roadway (T1. 37, 39) nor extending out over the white line (T1. 39-40). She testified that it is her belief that these photographs evidence that the truck has been moved (T1. 37-38). She testified that unlike what is shown in one of the photographs, there were no cones by the trucks (T1. 38). She further testified that she did not observe the truck move while she was in her vehicle (T1. 39).
Ms. Mortimer testified that there was nothing that kept her from seeing the entire truck, including the stabilizing arm she struck, as she approached it from Route 42/97 on the morning of the accident (T1. 41). She testified that she was looking forward as she approached the truck, did not see the stabilizing arm prior to impact nor was there anything that was obstructing her lane of travel as she drove (id.).
Desalaines Seda
Mr. Seda, Claimant's son, testified that he learned of the accident on October 3, 2018, by receiving a phone call from Claimant's On Star service, as well as a phone call from his brother (T1. 44). He testified that by the time he received the phone calls and appeared at the accident scene, five minutes had elapsed (T1. 45). He testified that he "observed there was like a big traffic jam. There was like cars backed all the way up, so [he] had to pull [his] car on the shoulder and run all the way down on foot to her car, which was in the middle of the intersection, like on the yellow line, spun sideways. [He] noticed upon walking up to the carbefore [he] could even see her [he] just noticed that the door was kind of ripped forward, like just mangled. The car was, broken glass everywhere, red lights, firetrucks. You know, it was a pretty crazy scene" (id.). He testified after reviewing Claimant's Exhibit 6 that the photograph depicted what he observed upon arrival at the accident scene (T1. 46).
Mr. Seda testified after reviewing Claimant's Exhibit 4, the photograph depicted the white work trucks he observed at the accident scene, and described one of the trucks to include a stabilizing arm that was located on the side of the truck and came up about "waist high," a few feet off the truck itself (T1. 47-48). He then testified that the truck in this photograph did not contain a stabilizing arm and was yellow/orange, not white (T1. 48-50). He testified that the [*4]police officer who responded to the scene took photographs of the accident scene that he viewed at the hospital, shortly after they were taken (T1. 49).
Mr. Seda testified after reviewing Defendant's Exhibit C, the photograph depicted where he observed his mother's car after the accident and the location where the trucks were parked along the side of the road (T1. 51-52). He then testified that he does not recall the positioning of the trucks (T1. 53) and is unsure which way his mother's vehicle was facing, just that "it was spun out in the middle of the road" and was across the yellow line (T1. 54). He went on to testify that the third photograph contained in Defendant's Exhibit C does not depict the stabilizing arm on the truck that he testified his mother's vehicle hit (T1. 55) and could not recall what color truck he observed the stabilizing arm was extended out of when he appeared at the scene of the accident (T1. 56). Mr. Seda testified after reviewing Defendant's Exhibits K, L and O, that he did not observe any stabilizing arm retracted from the DOT trucks (T1. 59-60). He testified that he observed photographs being taken by the Deerpark police officer at the scene of the accident (T1. 60).
Jerry Williams
Jerry Williams was called as Defendant's only witness. On consent of both parties, Mr. Williams testified prior to Claimant completing her case-in-chief. Mr. Williams testified that he has worked for the DOT for over 9 years and was employed by DOT in October of 2018 (T1. 63) as a highway maintenance worker, operating a state motor vehicle, a 2019 international dump truck, as well as patching potholes, removing debris, cutting brush, and repairing catch basins (T1. 64). He testified that he recalls being involved in an accident on October 3, 2018 on Route 42/97, between Port Jervis and Sparrow Bush, while installing blacktop, and excavating and repairing recently installed catch basins in front of a business where there was a water issue (id.). Mr. Williams testified that he was operating a tandem axle dump truck that consisted of a stainless-steel body with a yellow cab and blue hood, which was parked on the shoulder of the road facing southbound next to the northbound lane (T1. 65). He testified that he was the only person operating the vehicle that contained a backhoe with a stabilizing arm that was used to pick up the material and put it on the blacktop (T1. 66). He testified that the backhoe was at least 102 inches away from the lanes of travel on Route 42/97 and was entirely on the shoulder of the road (id.).
Mr. Williams testified that as part of the work zone, orange cones were put out along the fog lines between the trucks and the travel lane to separate the DOT trucks from the oncoming traffic on the highway (T1. 67). However, he later testified after reviewing his deposition testimony, he does not recall whether the cones were placed on the fog lines or in between the trucks and the fog line (T1. 73-74). He testified that while he was parked on the shoulder of the roadway, sitting in the truck with the motor off "[he] was leaned out the window talking to [his] coworkers that were on the ground beside [him], and [he] felt the truck move. [He] didn't know exactly what had happened til [he] looked in the mirror and saw a vehicle that had hit the side of the truck" (T1. 67). He went on to testify that he got out of the truck and talked with his supervisor, while one of his co-workers shut the road and turned around on-coming traffic (id.). Mr. Williams did not observe the accident (T1. 75) but afterwards, observed that the truck had been struck in a few places: the passenger side lower step, the wing brace where the wing mounts onto the truck, the battery box behind the wing and the front outside tire (T1. 68).
After reviewing Claimant's Exhibit 1, Mr. Williams testified that the truck is depicted as [*5]it was parked before the accident and was not moved any time before or after the accident (T1. 69). He testified that his truck does not contain a stabilizing arm, but rather a black object permanently affixed to the side of the truck, called the wing plow, (id.) which slides up and down, and does not come in and out, (T1. 69-70) as well as a grey screw that attaches to the wing (T1. 77). He went on to testify that the plow supports the wing tower and the nose plow on the front of the truck (T1. 74). Mr. Williams testified that the second set of holes depicted in the photograph is also used for screws (T1. 77).
After reviewing Claimant's Exhibit 5, Mr. Williams testified that the truck is depicted as it was parked before the accident and was not moved any time before or after the accident occurred (T1. 69). He testified that from the time of the impact with Claimant's vehicle until the time he drove the truck back to the yard on the day of the accident, his vehicle had not been moved for any reason (T1. 79).
Mr. Williams testified that besides the dump truck he was operating, there were three additional DOT vehicles on scene, a F350 rock truck, F250 pickup truck and a mason dump truck and was unsure whether his dump truck was the third or fourth DOT vehicle in line (T1. 71). He testified that roadwork signs were placed on the road that day, but he was unaware by who and what type of signs they were (T1. 72). He further testified that the cones in the photograph were moved after the accident (T1. 76) however, he recalls the cones being placed once he arrived at the job site (T1. 82).
Officer Christine Garry
Claimant called Officer Garry to testify. Officer Garry testified as to her employment and training background as a police officer, which included training in investigating motor vehicle accidents, learning how to write the Motor Vehicle Accident MV-104A form, specifically how to identify the direction the vehicle was proceeding in and what each number on the form means (T2. 6-7). She testified that during her six-year career as a police officer, she has investigated "a couple hundred" motor vehicle accidents (T2. 7).
Officer Garry testified that she was called to the accident in question while responding to a traffic stop on Neversink Drive and was one of the first responders on scene (id.). She testified it took her approximately 7 to 10 minutes to arrive after she received the call (T2. 9). When she arrived, she observed Claimant sitting in her vehicle that had been completely turned around (T2. 7-8). She testified that she investigated the accident, and observed the DOT truck involved in the accident, with "a piece of metal that was sticking out from the truck as part of it" (T2. 8). "It wasn't on the white line. It was near it but it wasn't there" (T2. 8-9). She went on to testify that she recalls orange diagonal construction signs stating "construction up ahead" posted on the road, as she proceeded to arrive to the scene of the accident and a cone right in front of the truck (id.).
Officer Garry testified that as a result of the accident, she generated a MV-104A Form (Defendant's Exhibit A) and set forth an accident description based upon her investigation and conversations with both Claimant and DOT employee, Jerry Williams (T2. 10-13). She testified that she wrote that Claimant hit the arm of the truck or something that was sticking out from the DOT truck, based upon her conversation with Claimant, as she was not a witness to the accident (T2. 14-15). She testified that she observed the arm of the truck sticking out of the DOT truck (T2. 16-18), however, the arm did not protrude out over the white line and into the travel lane of the roadway (T2. 18). Officer Garry testified that based on her investigation and examination of [*6]the evidence at the accident scene, she did not see any reason why Claimant left her travel lane to strike the DOT truck (id.). She went on to testify that Claimant advised her that the DOT truck's arm was sticking out in the travel lane, but it was clear to Officer Garry that this was an active work zone and Claimant should not have been that close to the fog line, despite the fact that her observation was that the arm of the truck was not sticking out at all (id.). Officer Garry testified that in her view, there was nothing that the DOT driver did to contribute to the happening of this accident (T2. 19).
 LAW AND ANALYSIS
The Court is tasked with determining, based upon a careful review of the testimony of the witnesses and exhibits in evidence, whether Defendant owed a duty to Claimant and if Defendant breached that duty, whether the alleged negligence was the proximate cause of Ms. Mortimer's injuries.
Vehicle and Traffic Law [VTL] § 1103 (b) exempts all motor vehicles and other equipment from the rules of the road when they are "actually engaged in work on a highway" . . . standard of care applicable to vehicles engaged in work on a highway is the same "reckless disregard" standard applicable to vehicles engaged in emergency operations pursuant to VTL section 1104 (b) (Riley v County of Broome, 95 NY2d 455, 466 [2000]).
The reckless disregard standard is set forth in Saarinen v Kerr, 84 NY2d 494, 501 [1994], which holds as follows: "[The reckless disregard] standard demands more than a showing of a lack of 'due care under the circumstances' - - the showing typically associated with ordinary negligence claims. It requires evidence that 'the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow' and has done so with conscious indifference to the outcome (Prosser and Keeton, Torts § 34, at 213 [5th ed]; see Restatement [Second] of Torts § 500)."
It is undisputed that Mr. Williams was engaged in work on a highway and therefore, the reckless standard is applicable pursuant to VTL Section 1103. There is no proof in the evidence adduced at trial that demonstrated that Mr. Williams' operation of the DOT truck was an intentional act of an unreasonable character done with conscious indifference to the outcome. The Court finds that Mr. Williams' testimony that the DOT truck was within the white line and did not impede on the travel lane is credible. The Court cannot conclude that Mr. Williams' conduct rises to the level of reckless disregard.
To establish a prima facie case of negligence, " 'a [claimant] must establish the existence of a duty owed by a defendant to the [claimant], a breach of that duty, and that such breach was a proximate cause of injury to the [claimant]' " (Comack v VBK Realty Assoc., Ltd., 48 AD3d 611, 612 [2d Dept 2008], quoting Nappi v Incorporated Vil. of Lynbrook, 19 AD3d 565, 566 [2d Dept 2005]; see Akins v Glens Falls City School Dist., 53 NY2d 325, 333 [1981]; Mojica v Gannett Co., Inc., 71 AD3d 963, 965 [2d Dept 2010]; PJI 2:10). "A driver is negligent when an accident occurs because he or she failed to see that which through the proper use of his or her senses he or she should have seen" (Benn v New York Presbyt. Hosp., 120 AD3d 453, 455 [2d Dept 2014], quoting Katanov v County of Nassau, 91 AD3d 723, 725 [2d Dept 1012]; see Weigand v United Traction Co., 221 NY 39, 42 [1917]; Starkman v City of Long Beach, 106 AD3d 1076, 1078 [2d Dept 2013]).
The Court finds that Defendant's failure to place a flagman at the scene to direct traffic away from the shoulder was not sufficient to establish that defendant's conduct was reckless. Mr. [*7]Williams credibly testified that his co-workers placed signs notifying motorists that construction was being conducted on the road ahead, as well as cones indicating that there were DOT trucks on the side of the road and to be aware of them. In addition, Ms. Mortimer testified that she saw the DOT trucks 400 to 500 feet ahead of her so regardless of the signage or cones placed by the DOT employees, Ms. Mortimer was aware that the DOT trucks were parked on the shoulder up ahead.

DECISION
Having carefully reviewed the credible testimony and evidence, it is clear that the State did not breach its duty owed to Claimant as it is undisputed that Defendant's DOT employees were engaged in work on a highway at the time of the accident. Therefore, applying the reckless disregard standard of care, and in consideration of the unrefuted and credible testimony that the DOT truck, as well as the stabilizing arm, were within the white line and did not enter the lane of travel, coupled with Officer Garry and Mr. Williams' testimony that signage and cones were placed on the road indicating that there was construction being conducted ahead, Defendant did not breach its duty.
Furthermore, the Court finds that Mr. Williams was not the proximate cause of the accident, as the Court did not find Ms. Mortimer's testimony that the DOT truck and/or its stabilizing arm were in her lane of travel credible, and because Ms. Mortimer had a duty as a driver to "see what is to be seen" and act accordingly. She testified that she saw the trucks 400 to 500 feet in front of her and that the skies were clear and provided no evidence that there was anything obstructing her view as she approached the DOT trucks. Ms. Mortimer should have seen the construction signs and cones and heeded accordingly.
Under the facts presented at trial, there is no basis to conclude that Mr. Williams operated his vehicle with the type of knowing reckless disregard required under VTL § 1104 to establish Defendant's liability. Absent such showing, the claim must be dismissed.
Accordingly, it is hereby
ORDERED that Claim No. 133691 is hereby DISMISSED.
In light of the above determination, any motions made at trial upon which the Court had previously reserved, or which remain undecided are denied.
The Clerk of the Court is directed to enter judgment accordingly.
Dated: September 23, 2024
Hauppauge, New York
LINDA K. MEJIAS-GLOVER
Judge of the Court of Claims

Footnotes

Footnote 1:"T1." shall refer to Trial Transcript Page of December 6, 2023, trial date.

Footnote 2:Claimant's deposition transcript is marked as Defendant's Exhibit P.